Michael D. Fitzgerald
Law Offices of Michael D. Fitzgerald
1 Industrial Way W., Building B
Eatontown, NJ 07724
Telephone (732) 223-2200

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Azam Rahimi & Radif Rashid; | § | |
| STATE OF NEW JERSEY *ex rel.* | § | CIVIL ACTION NO.15-6536-BRM-DEA |
| Azam Rahimi & Radif Rashid; | § | |
| STATE OF NEW YORK *ex rel.* | § | |
| Azam Rahimi & Radif Rashid; and | § | RELATOR AZAM RAHIMI & RADIF |
| STATE OF OKLAHOMA *ex rel.* | § | RASHID'S SECOND AMENDED |
| Azam Rahimi & Radif Rashid; | § | COMPLAINT PURSUANT TO |
| | § | U.S.C. §§ 3729 – 3732 FEDERAL |
| | § | FALSE CLAIMS ACT AND VARIOUS |
| Plaintiffs, | § | STATE FALSE CLAIMS ACTS |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| Zydus Pharmaceuticals (USA), Inc., | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

### RELATORS AZAM RAHIMI AND RADIF RASHID'S SECOND AMENDED COMPLAINT

Table of Contents

I.     Introduction ...............................................................................................1

II.    Parties........................................................................................................2

     A.    Introduction to Relators ......................................................................2

     B.    Introduction to Government Plaintiffs ................................................4

     C.    Defendant Zydus Pharmaceuticals (USA), Inc. ................................4

III.    Jurisdiction and Venue.............................................................................5

IV.    Respondeat Superior and Vicarious Liability ...........................................5

V.    Medicaid Reimbursement for Generic Drugs ..........................................5

     A.    Overview of the Medicaid Program....................................................5

     B.    Medicaid Drug Reimbursement ..........................................................6

           1.    National Drug Codes.....................................................................6

           2.    Medicaid Reimbursement Formulas .............................................9

                i.    Establishing the EAC .................................................................10

                ii.    MAC and FUL ..........................................................................11

VI.    Zydus's Fraudulent Pricing Scheme ......................................................13

     A.    Fraudulent Reporting of Prices .........................................................13

     B.    Pricing of Zydus's Generic Drugs ...................................................14

VII.    Actionable Conduct by Zydus Under the False Claims Act .....................18

     A.    Applicable Law .................................................................................18

           1.    The False Claims Act...................................................................18

           2.    The Federal Anti-Kickback Statute .............................................20

     B.    Zydus's Violations of the FCA .........................................................22

1.      Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A); formerly 31 U.S.C. § 3729(a)(1))……… .................................................22

2.      Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B); formerly 31 U.S.C. § 3729(a)(2)) ............................................................23

3.      Conspiracy to Defraud the Government (31 U.S.C. § 3279(a)(1)(C); formerly 31 U.S.C. § 3729(a)(3)) ...........................................................26

VIII.   Causes of Action        ....................................................................27

A.      Count I – False Claims (31 U.S.C. § 3729(a)(1)(A); formerly 31 U.S.C. § 3729(a)(1))   .........................................…………………………………27

B.      Count II – False Records or Statements (31 U.S.C. § 3729(a)(1)(B); formerly 31 U.S.C. § 3729(a)(2)) ..........................................................28

C.      Count III – Conspiracy to Defraud the Government (31 U.S.C. § 3729(a)(1)(C); formerly 31 U.S.C. 3729(a)(3)) ...................................29

D       Count IV - California False Claims Act   ..........................................30

E.      Count V – Connecticut Act Implementing the Provisions of the Budget Concerning Human Services and Making Changes to Various Social Services Statutes ....................................................................30

F.      Count VI - Colorado Medicaid False Claims Act ...............................30

G.      Count VII - Delaware False Claims and Reporting Act .......................30

H.      Count VIII - District of Columbia Procurement Reform Amendment Act ..........31

I.      Count IX - Florida False Claims Act  ..................................................31

J.      Count X - Georgia False Medicaid Claims Act ...................................31

K.      Count XI - Hawaii False Claims Act ...................................................31

L.      Count XII - Illinois Whistleblower Reward and Protection Act..........................31

M.      Count XIII - Indiana False Claims and Whistleblower Protection Act ..............31

N.      Count XIV - Iowa False Claims Act......................................................31

O.      Count XV - Louisiana Medical Assistance Programs Integrity Law ..................32

P. Count XVI - Maryland False Claims Act ...............................................32

Q. Count XVII - Massachusetts False Claims Act ...................................32

R. Count XVIII - Michigan Medicaid False Claim Act ..............................32

S. Count XIX - Minnesota False Claims Act ...........................................32

T. Count XX - Montana False Claims Act................................................32

U. Count XXI - Nevada False Claims Act.................................................32

V. Count XXII - New Hampshire Medicaid Fraud and False Claims Act ...............33

W. Count XXIII – New Jersey False Claims Act........................................33

X. Count XXIV - New Mexico Medicaid False Claims Act ....................................35

Y. Count XXV - New York False Claims Act ...........................................35

Z. Count XXVI – North Carolina False Claims Act ..................................38

AA. Count XXVII – Oklahoma Medicaid False Claims Act ........................38

BB. Count XXVIII - Rhode Island State False Claims Act ........................40

CC. Count XXIX - Tennessee Medicaid False Claims Act .........................40

DD. Count XXX – Texas Medicaid Fraud Prevention Act .........................40

EE. Count XXXI - Virginia Fraud Against Taxpayer Act .........................41

FF. Count XXXI - Wisconsin False Claims Act………………………………41

GG. Count XXXII – City of Chicago False Claims Act .............................41

HH. Count XXXIII – Common Fund Relief ................................................41

IX. Demand for Jury Trial...............................................................................42

X. Documentary Evidence ………………………………………………………42

1.     On behalf of the United States of America and the States of New Jersey, New York, and Oklahoma ("Government Plaintiffs"), and on their own behalf, Plaintiff/Relators Azam Rahimi and Radif Rashid ("Relators") bring this action pursuant to the federal False Claims Act (FCA), 31 U.S.C. § 3729-3732, and the *qui tam* statutes of the above-captioned States. Relators seek to recover all damages, penalties, and other remedies established by the federal and state false claims acts on behalf of the Government Plaintiffs and themselves. Relators would respectfully show the following:

## I.     INTRODUCTION

2.     This suit concerns Zydus Pharmaceuticals (USA), Inc.'s ("Zydus") fraudulent inflation of its prices for generic drugs, specifically, Amiodarone Hydrochloride Tablets, Anastrozole Tablets, Carvedilol Tablets, Divalproex Sodium Capsules, Meloxicam Tablets, Paroxetine Tablets, Tamsulosin Hydrochloride Capsules, Topiramate Tablets, Venlafaxine Hydrochloride Tablets, and Warfarin Sodium Tablets, collectively referred to herein as Zydus's generic drugs.

3.     Since 2006, Zydus has reported to various drug price publishers inflated drug prices, knowing Medicaid would rely on those prices when setting reimbursement rates for Zydus's generic drugs.  Zydus's actual sales prices were and are far lower than the prices reported by Zydus.  By knowingly reporting fraudulently inflated prices, Zydus has caused state Medicaid programs to calculate inflated Estimated Acquisition Costs (EAC) and reimburse Zydus's generic drugs at inflated rates.

4.     Zydus's nationwide fraudulent pricing scheme has also inflated the Federal Upper Limit ("FUL") pricing ceilings for the generic drugs subject to FULs. During the relevant time period, the federal government used the prices reported to drug price publishers to establish FUL

reimbursement rates for generic drugs.  State Medicaid programs may use the FUL as a basis for reimbursement. State Medicaid programs may also set Maximum Allowable Cost ("MAC") reimbursement rates for generic drugs, and states rely on reported prices when setting MACs. For each generic drug at issue in this suit, Zydus's price inflation caused Medicaid to pay too much, not only for that drug, but for all generic drugs in that drug's therapeutic class.

5.     Zydus has also ensured that its retail pharmacy customers who dispense the Zydus generic drugs receive inflated reimbursement and profits from Medicaid.  Well acquainted with Medicaid reimbursement rates, Zydus relies on the resulting "spread" between the fraudulently inflated prices it reports and the prices its retail pharmacy customers pay as an inducement to those customers to purchase Zydus's generic drugs.

6.     Zydus's nationwide fraudulent pricing scheme has allowed it to increase its profits by boosting sales for the Zydus generic drugs. Zydus recognized in its 2008 Investor Presentation that the United States is the largest generics market in the world and is thus a principal market for Zydus.  Zydus first targeted the United States market in 2005 and by 2010 had launched twenty-nine generic products, making it among the top twenty generic companies in the United States.  In 2010, Zydus realized posted sales of approximately $149 million.

## II.     PARTIES

### A.     Introduction to Relators

#### 1.     Azam Rahimi

7.     Relator Azam Rahimi currently resides in Bristow, Virginia.  He has been a licensed pharmacist since receiving his pharmacy degree in 2007 from St. John's University College of Pharmacy and Allied Health Professions Doctor of Pharmacy Degree Program in Queens, New York.  Upon acquiring his license he worked the next two years as a pharmacist for

Walgreens.  In November of 2009, Relator Rahimi opened his own pharmacy, Potomac Health Pharmacy in Woodbridge, Virginia.  In 2010 Rahimi chose to close this pharmacy.  It was during the time he owned his own pharmacy that he discovered Defendant's fraudulent pricing scheme.

### 2.    Radif Rashid

8.    Radif Rashid also received his pharmacy degree from St. John's University College of Pharmacy and Allied Health Professions Doctor of Pharmacy Degree Program in Queens, New York.  He graduated in the spring of 2009 and received his New York State pharmacist license in the fall of that year.  Relator Rashid has been a pharmacist with his family's pharmacy, Fancy Pharmacy, since receiving his pharmacist license.

9.    Relator Rashid's family has owned Fancy Pharmacy, located at 131 Essex Street, New York City, New York, for over thirty years. In addition to serving the neighborhood residents' pharmaceutical needs, Fancy Pharmacy also sells other goods and sundries, such as over-the-counter medications.

10.    As a pharmacist for Fancy Pharmacy, Relator Rashid has worked with two wholesalers, Kinray, Inc. and AmerisourceBergen.  Rashid receives pharmaceutical pricing lists from these two wholesalers which include the list of available generic drugs, the drugs' manufacturer, and the related price.  Relator Rashid routinely chooses the drugs to stock at Fancy Pharmacy based on the lowest price available.  It was when Relator began processing the claims for the Zydus generic drugs that Relator discovered the Defendant's fraudulent pricing scheme.

11.    As fully explained in the Original Complaint, Relator Rahimi began his initial investigation of the pricing disparity that appeared in several of the generic drug manufacturers' pricings offered to him at this former retail pharmacy, the Potomac Health Pharmacy, which was

located in Woodbridge Virginia.  Relator Rahimi's investigation led him to Zydus, a relatively

new company to the generic manufacturers' marketplace.

      12.     Meanwhile, as explained above, Relator Rashid had also became aware of the

pricing disparity and resulting higher reimbursement rates on Medicaid claims when he began

processing claims at Fancy Pharmacy.  The two relators began discussing this issue of pricing

disparity and higher reimbursement of the Medicaid claims for generic drugs.

      13.     Relators Rahimi and Rashid compared the pricing data from Rahimi's wholesaler,

Cardinal Health, as well as Relator Rashid's pricing data from his wholesalers, Kinray and

AmerisourceBergen, to the amount of reimbursement for claims that Relator Rashid had

submitted for payment to Medicaid.  They found that all of Rashid's claims had similar high

reimbursement rates for Zydus's drugs.  Relators gained first-hand knowledge of Zydus'

fraudulent pricing scheme through their investigation and have the claims documents that reflect

that the Zydus drugs at issue are part of Zydus's fraudulent pricing scheme.

**B.**     **Introduction to Government Plaintiffs**

      14.     The Government Plaintiffs in this lawsuit are the United States of America and

the States of New Jersey, New York, and Oklahoma.

**C.**     **Defendant Zydus Pharmaceuticals (USA), Inc.**

      15.     Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a subsidiary of Cadila

Healthcare Ltd., the fifth largest pharmaceutical company in India, which in turn is part of the

Zydus Cadila Group, located in Ahmedabad, India.  Zydus has its headquarters in Princeton,

New Jersey.  Its corporate headquarters are in Ahmedabad, India. Zydus provides generic drugs

to the American pharmaceutical market.  Zydus conducts extensive business in California,

Connecticut, Colorado, Georgia, Illinois, Indiana, Louisiana, Michigan, Nevada, New Jersey,

New York, Oklahoma, and Wisconsin. Zydus may be served through its registered agent, Joseph D. Renner, 210 Carnegie Center, Ste. 103 Princeton, New Jersey 08540.

### III.   JURISDICTION AND VENUE

16.   Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relators' claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Zydus, some of which occurred in the District of New Jersey. Zydus engages in business in the District of New Jersey and is subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729. Pendent jurisdiction is also proper over Relators' state claims under 18 U.S.C. § 3732 and 28 U.S.C. § 1367.

### IV.   RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

17.   Any and all acts alleged herein to have been committed by Zydus were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Zydus and within the course and scope of their employment.

### V.   MEDICAID REIMBURSEMENT FOR GENERIC DRUGS

#### A.   Overview of the Medicaid Program

18.   Medicaid was established by Title XIX of the Federal Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Program").  Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

19.   The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  *See* 42 U.S.C. § 1396a.  The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"),

is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b). Among the various states, the FMAP is at least 50%, and runs as high as 83%.

20.     The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

21.     States require drug manufacturers to submit an application in order to be placed on the state's formulary list and receive reimbursement from the state's Medicaid program. As part of these applications, drug manufacturers are required to certify that they will comply with all laws, regulations and rules applicable to the Medicaid program, including the federal and state Anti-Kickback Statutes.

22.     A pharmacy provider must also submit an application to the state in order to enroll as a Medicaid provider, submit claims to the Medicaid program, and receive reimbursement from state and federal funds. These applications require pharmacy providers to certify that they will comply with all laws, regulations and rules applicable to the Medicaid program, including the federal and state Anti-Kickback Statutes. When a pharmacy provider submits claims to the Medicaid program, it certifies that it has complied with all laws, regulations, and rules applicable to the Medicaid program.

**B.     Medicaid Drug Reimbursement**

**1.     National Drug Codes**

23.     The Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA assigns to each listed

drug product a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC").

Zydus's five digit NDC prefix is 68382.  The FDA has assigned the following NDC codes for

Zydus's generic drugs:

| Name of Generic Product | NDC CODE |
|---|---|
| Amiodarone | 68382-0227-05 |
| | 68382-0227-14 |
| | |
| Anastrozole | 68382-0209-06 |
| | |
| Carvedilol | 68382-0092-01 |
| | 68382-0092-05 |
| | 68382-0093-01 |
| | 68382-0093-05 |
| | 68382-0094-01 |
| | 68382-0094-05 |
| | 68382-0095-01 |
| | 68382-0095-05 |
| | |
| Divalproex | 68382-0031-01 |
| | 68382-0032-05 |
| | 68382-0033-05 |
| | 68382-0106-01 |
| | 68382-0106-10 |
| | |
| Meloxicam | 68382-0050-01 |
| | 68382-0050-05 |
| | 68382-0051-01 |
| | 68382-0051-05 |
| | |
| Paroxetine | 68382-0001-05 |
| | 68382-0001-06 |
| | 68382-0001-16 |
| | 68382-0097-05 |
| | 68382-0098-01 |
| | 68382-0098-05 |
| | 68382-0098-06 |
| | 68382-0098-16 |
| | 68382-0098-10 |
| | 68382-0097-10 |
| | 68382-0099-10 |
| | 68382-0099-05 |
| | 68382-0099-06 |

|  |  |
|---|---|
|  | 68382-0099-16 |
|  | 68382-0097-06 |
|  | 68382-0097-16 |
| Tamsulosin HCL | 68382-0132-01 |
|  | 68382-0132-10 |
| Topiramate | 68382-0138-14 |
|  | 68382-0140-14 |
|  | 68382-0005-14 |
|  | 68382-0004-14 |
|  | 68382-0141-14 |
|  | 68382-0139-14 |
| Venlafaxine | 68382-0101-01 |
|  | 68382-0018-01 |
|  | 68382-0019-01 |
|  | 68382-0020-01 |
|  | 68382-0021-01 |
|  | 68382-0034-06 |
|  | 68382-0034-16 |
|  | 68382-0035-06 |
|  | 68382-0035-10 |
|  | 68382-0035-16 |
|  | 68382-0036-06 |
|  | 68382-0036-10 |
|  | 68382-0036-16 |
| Warfarin | 68382-0052-01 |
|  | 68382-0052-10 |
|  | 68382-0053-01 |
|  | 68382-0053-10 |
|  | 68382-0054-01 |
|  | 68382-0054-10 |
|  | 68382-0055-01 |
|  | 68382-0055-10 |
|  | 68382-0056-01 |
|  | 68382-0056-10 |
|  | 68382-0057-01 |
|  | 68382-0058-01 |
|  | 68382-0059-01 |
|  | 68382-0064-01 |
|  | 68382-0064-10 |

24.     Zydus, similar to other generic drug manufacturers, does not typically submit claims for reimbursement to federal health care programs. Instead, pharmacy providers purchase Zydus's generic drugs either directly from Zydus or through wholesalers.  After dispensing the Zydus products, these pharmacy providers submit claims to payors, such as Medicaid, for reimbursement. Medicaid claims submitted by retail pharmacies are typically processed and tracked using the NDC code for the particular drug.

25.     Zydus reports to various drug price publishers the amounts that it supposedly charges for its drugs.  The price publishers publish this information in their compendia, such as the *Red Book*. States in turn rely on this published pricing information to determine the reimbursement rates for drugs, including Zydus's generic drugs.

26.     Zydus offers the generic drugs at issue to its retail pharmacy customers at prices that are consistently, and quite significantly, lower than those it reports to pricing compendia.  Its false and fraudulent reporting of inflated prices causes Medicaid programs to reimburse retail pharmacies' claims at rates far higher than the rates at which Zydus sells the generic drugs to pharmacies and wholesalers, as described below.

## 2.    Medicaid Reimbursement Formulas

27.     The goal of the states' Medicaid programs is to reimburse for drugs at an amount that reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public for covered drugs.  Federal regulations define EAC in part as "the agency's best estimate of the price generally and currently paid by providers for a drug…." 42 C.F.R. § 447.301.   To determine the EAC for a covered drug, state Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of Health and Human Services.

28.    While each state's specific reimbursement formula varies, the state Medicaid programs generally reimburse for each drug based on the lowest of (a) the EAC as set by the states, (b) the Maximum Allowable Cost ("MAC") set by the state, or (c) the provider's usual and customary charge.  The provider's usual and customary charge is typically not the lowest price and therefore is seldom used.

i.    **Establishing the EAC**

29.    The different state methodologies for arriving at EAC include:

(1)    discounting a percentage off of the Average Wholesale Price ("AWP");

(2)    adding a percentage to the Wholesale Acquisition Cost ("WAC"); and /or

(3)    requiring the drug companies to certify prices directly in writing to the Medicaid program.

30.    "AWP" is used to refer to the price at which a pharmaceutical firm or wholesaler sells a drug to a retail customer.  "WAC" is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail customer.

31.    While the majority of states have used published AWPs to calculate reimbursement, ten states (Alabama, Florida, Maryland, Massachusetts, Mississippi, Missouri, North Dakota, Pennsylvania, Rhode Island and Texas) have used the WAC to set the EAC.

32.    The Centers for Medicare and Medicaid ("CMS") have compiled in a report the Medicaid reimbursement formulas for each state, including the formulas based on the reported AWP prices.  This report, titled "Medicaid Prescription Reimbursement Information by State – Quarter Ending June 2011, clearly illustrates the formula each state utilizes, incorporating the reported AWP, to establish the pricing for generic drugs.  Exhibit 13, Medicaid Prescription Reimbursement Information by State – Quarter Ending June 2011 *available at* http://www.cms.gov/Reimbursement/Downloads/1Q2011ReimbursementChart.pdf.

33.    The AWPs and WACs upon which the state Medicaid programs rely are those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications; (2) First Databank, publisher of the *Blue Book* and other electronic publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide.   Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data service are hereinafter referred to as "Price Publications."

34.    In addition to relying upon the manufacturers' reported prices as published in the Price Publications, some state Medicaid programs, including Texas, also receive price representations directly from the manufacturers, and rely on these representations to confirm the accuracy of the figures they use to determine state reimbursements.

35.    Pursuant to section 6001 of the Deficit Reduction Act of 2005, Pub.L. 109-171, (effective January 1, 2007), section 2503 of the Patient Protection and Affordable Care Act Pub.L. 111-148 (2010) and the Education Jobs and Medicaid Assistance Act Pub. L. 111-226 (2010), CMS is required to provide States with "average manufacturer price" data as that term is now defined, effective October 1, 2010, giving the States additional drug price information.

ii.    **MAC and FUL**

36.    Additionally, for generic or multiple source drugs, states may establish their own payment ceilings known as MAC.  When multiple generic equivalent drugs are available, states have the option of imposing a MAC that sets a cap on the reimbursement payment for the brand and generic versions of the same drug.  The states may set this cap as long as they do not exceed in the aggregate the federal payment ceiling for drugs subject to a FUL.  CMS establishes the FUL drug list in accordance with the criteria established in 42 C.F.R. §447.332 and Section

11

1927(e) of the Social Security Code as amended by OBRA 1993.[1]  In doing so, CMS relies upon the published compendia of cost information of drugs in the Price Publications.  As establishing a MAC is optional, states do not necessarily adopt a MAC for every available generic drug. Exhibit 13, submitted with Relators' First Amended Complaint, includes data on which of the states have adopted MAC pricing for its generic drugs.   Exhibit 13, Medicaid Prescription Reimbursement Information by State – Quarter Ending June 2011 *available at* http://www.cms.gov/Reimbursement/Downloads/1Q2011ReimbursementChart.pdf.

37.     States have various methods for establishing a MAC, including: (i) setting the MAC at the lowest published price for a generic version of the drug, (ii) manually setting a MAC based on surveys of pharmacies to determine the actual acquisition costs for generics from manufacturers, (iii) using the FUL that is updated twice a year, if a FUL is available, or (iv) by utilizing a methodology that includes AWP and/or WAC as a benchmark, as with Oklahoma's Medicaid program, for example. Under the MAC formula, states establish a single price for each generic regardless of the manufacturer of the generic.  As of the last quarter of 2009, all but three states had established MACs.  If a generic does not have a MAC price, the state generally reimburses pharmacies at AWP minus a range of ten to twenty-five percent for the drug.

38.     As stated above, CMS establishes the FUL pricing based on the manufacturers' reported prices to the price publishers.  Under 42 C.F.R. § 447.332, CMS is required to establish a FUL price for a generic when three or more formulations of the drug are rated by the FDA as therapeutically equivalent.  Generic drugs are rated therapeutically equivalent when the drugs are chemically the same and each has the same medical effect.  Generally only drugs that receive an

---

[1] The definitions of FUL and AMP for multiple source drugs have been amended in section 6001 of the Deficit Reduction Act of 2005, Pub.L. 109-171, effective January 1, 2007, and section 2503 of the Patient Protection and Affordable Care Act Pub.L. 111-148 (2010) and the Education Jobs and Medicaid Assistance Act Pub. L. 111-226(2010), now in full effect since October 2010.

"A" rating for therapeutic equivalence in the federal publication the "Orange Book" are qualified for FUL drug pricing.  Before November 2010, when the federal rules governing FUL pricing under 42 CFR § 447.514 became final, the FUL pricing was set at 150% of the lowest published AWP or WAC for therapeutically equivalent drugs purchased by pharmacists in quantities of one hundred tablets or capsules, plus a reasonable dispensing fee.

## VI.   ZYDUS'S FRAUDULENT PRICING SCHEME

### A.    Fraudulent Reporting of Prices

39.    Based on Relators' direct and independent knowledge, Zydus has defrauded the Government Plaintiffs by knowingly causing Medicaid programs to pay false or fraudulent prices for Zydus generic drugs since at least 2006.  As part of its conduct, Zydus knowingly made false or fraudulent representations about its drug prices and costs to the Publishers, knowing that Medicaid programs would use this information to calculate reimbursement rates when paying or approving claims for these drugs.  Zydus made these representations in order to use the "spread" between the price offered to its customers and the actual reimbursement from Medicaid to induce its retail pharmacy customers to purchase its generic drugs.

40.    To induce the retail pharmacies to purchase its generic drugs, Zydus priced its drugs through the wholesalers at far lower prices than it reported to the Publishers and some states.  Medicaid made payments on the claims received from Zydus's retail pharmacy customers that were based on the inflated AWPs and WACs.  State Medicaid programs also relied on these published prices for establishing their MACs, as did CMS when determining the FUL. The resulting reimbursements out of state and federal funds far exceeded the retail pharmacies' actual costs for the drugs.

13

41. The AWP and WAC prices that Zydus reported had no relationship to the actual prices being paid by pharmacy customers for the Zydus generic drugs. Zydus knew that Medicaid programs used these published AWP and WAC prices to calculate reimbursement rates. Zydus also knew that CMS used these published prices to establish the FUL. Additionally, Zydus knew that the state Medicaid programs used these published prices to determine MACs or make reimbursements based on the FUL. Further, when Zydus reduced the drugs' costs for its retail pharmacy customers, it did not update any of its AWP or WAC pricing information.

**B.    Pricing of Zydus's Generic Drugs**

42. Relators specifically retain and adopt Exhibits 1-12 as submitted with the Original Complaint, as well as Exhibit 13 as submitted with the First Amended Complaint, and incorporate them in this Second Amended Complaint. As illustrated in these Exhibits, Zydus used false and fraudulent prices to induce its retail pharmacy customers to purchase its drugs. Exhibit 1 is an example of a report on pricing information Relator Rahimi ran from his Cardinal Health database. Cardinal Health was Relator's wholesaler. This report contains the prices Zydus offered its retail pharmacy customers, through the wholesaler, for the generic drugs at issue. This report contains Relator Rahimi's handwritten notes on the state of Texas's reimbursement rates for those drugs. Exhibit 2 sets forth the false and fraudulent prices reported by Zydus for the Zydus generic drugs. The table includes the prices at which Zydus invoiced its retail pharmacy customers for these drugs, New York State's Medicaid reimbursement for these drugs, as well as the AWP reported prices, the Texas WAC and available MACs, and the resulting pricing spreads.

43. Exhibit 3 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Venlafaxine Hydrochloride Tablets, which was FDA-approved as

14

a Zydus generic on June 13, 2008.  This invoice contains Zydus's reported AWP for one hundred tablets provided to the pharmacy, which was $218.49.  Zydus only invoiced the pharmacy $31.45 for those one hundred tablets.  The pharmacy actually dispensed ninety tablets, which resulted in a cost of $28.31.  The New York State Medicaid reimbursement, tied to the AWP or FUL, was $53.34 for those ninety tablets, which was significantly higher than the pharmacy's actual cost of $28.31.  The resulting spread for the ninety tablets was $25.03, which expressed as percentage equals 88.41%.

44.    Exhibit 4 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Amiodarone Hydrochloride Tablets, which was FDA-approved as a Zydus generic on September 16, 2008.  This invoice contains the reported AWP for 500 tablets provided to the pharmacy, which was $1,615.35.  Zydus only invoiced the pharmacy $63.96 for those 500 tablets.  The pharmacy actually dispensed ninety tablets, which resulted in a cost of $11.51.  The New York Medicaid reimbursement, tied to the AWP or FUL, was $30.76 for those ninety tablets, which was significantly higher than the pharmacy's actual cost of $11.51.  The resulting spread for ninety tablets was $19.25, which expressed as percentage equals 167.25%.

45.    Exhibit 5 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Divalproex Sodium Capsules, which was FDA-approved as a Zydus generic on January 27, 2009.  This invoice contains the reported AWP for 1,000 capsules provided to the pharmacy, which was $896.10.  Zydus only invoiced the pharmacy $405.08 for those 1,000 capsules.  The pharmacy actually dispensed ninety capsules, which resulted in a cost of $36.52.  The New York Medicaid reimbursement, tied to the AWP or FUL, was $50.24 for those ninety capsules, which was higher than the pharmacy's actual cost of $36.52.  The

resulting spread for the ninety tablets was $13.72, which expressed as a percentage equals 37.57%.

46.      Exhibit 6 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Tamsulosin Hydrochloride Capsules, which was FDA-approved as a Zydus generic on April 27, 2010.  This invoice contains the reported AWP for one hundred capsules provided to the pharmacy, which was $421.36.  Zydus only invoiced the pharmacy $22.50 for those one hundred capsules.  The pharmacy actually dispensed ninety capsules, which resulted in a cost of $20.25.  The New York Medicaid reimbursement, tied to the AWP or FUL, was $32.85 for those ninety capsules, which was higher than the pharmacy's actual invoiced cost of $20.25. The resulting spread for the ninety tablets was $12.60, which expressed as a percentage equals 62.22%.

47.      Exhibit 7 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Warfarin Sodium Tablets, which was FDA-approved as a Zydus generic on May 30, 2006.  This invoice contains the reported AWP for one hundred tablets provided to the pharmacy, which was $66.80.  Zydus only invoiced the pharmacy $7.50 for the one hundred tablets.  The pharmacy actually dispensed thirty tablets, which resulted in a cost of $2.25.  The New York Medicaid reimbursement, tied to the AWP or FUL, was $11.79 for the thirty tablets. The resulting spread for the thirty tablets was $9.54, which expressed as a percentage equals 424.00%.

48.      Exhibit 8 contains a claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Paroxetine Tablets, which was FDA-approved as a Zydus generic on March 7, 2007.  This invoice contains the reported AWP for thirty tablets provided to the pharmacy, which was $84.44.  Zydus only invoiced the pharmacy $4.10 for the thirty tablets. The pharmacy

dispensed thirty tablets, which resulted in a cost of $4.10. The New York Medicaid reimbursement, tied to the AWP or FUL, was $12.60 for the thirty tablets.  The resulting spread was $8.50, which expressed as a percentage equals 207.32%.

49.     Exhibit 9 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Anastrozole Tablets, which was FDA-approved as a Zydus generic on June 28, 2008.  This invoice contains the reported AWP for thirty tablets, which was $404.36.  Zydus only invoiced the pharmacy for $6.45 for the thirty tablets.   The pharmacy dispensed ninety tablets, which resulted in a cost of $19.35.   The New York Medicaid reimbursement, tied to the AWP or FUL, was $27.00 for the ninety tablets.  The resulting spread for the ninety tablets was $7.49, which expressed as a percentage equals 38.71%.

50.     Exhibit 10 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Carvedilol Tablets, which was FDA-approved as a Zydus generic on September 5, 2007.  This invoice contains the reported AWP for one hundred tablets, which was $213.69.   Zydus only invoiced the pharmacy $3.90 for the one hundred tablets.  The pharmacy dispensed sixty tablets, which resulted in a cost of $2.34.  The New York Medicaid reimbursement, tied to the AWP or FUL, was $5.70 for the sixty tablets.  The resulting spread for the sixty tablets was $3.36, which expressed as a percentage equals 143.59%.

51.     Exhibit 11 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Topiramate Tablets, which was FDA-approved as a Zydus generic on March 27, 2009.  This invoice contains the reported AWP for sixty tablets, which was $305.93.  Zydus only invoiced the pharmacy $3.94 for the sixty tablets.   The pharmacy dispensed sixty tablets, which resulted in a cost of $3.94.   The New York Medicaid

17

reimbursement, tied to the AWP or FUL, was $6.17 for the sixty tablets.  The resulting spread for the sixty tablets was $2.23, which expressed as a percentage equals 56.60%.

52.     Exhibit 12 contains a specific claim submitted and invoice received by Relator Rashid at Fancy Pharmacy for Meloxicam Tablets, which was FDA-approved as a Zydus generic on July 19, 2006.  This invoice contains the reported AWP for the one hundred tablets, which was $316.87.  Zydus only invoiced the pharmacy at $2.50 for one hundred tablets. The pharmacy dispensed thirty tablets, which resulted in a cost of $0.75.   The New York Medicaid reimbursement, tied to the AWP or FUL, was $1.50 for the thirty tablets.  The resulting spread for the thirty tablets was $0.75, which expressed as a percentage equals 100%.

53.     These exhibits clearly show that Zydus controlled and manipulated the reported prices for the Zydus generic drugs to boost their sales at the expense of Medicaid.

## VII.   ACTIONABLE CONDUCT BY ZYDUS UNDER THE FALSE CLAIMS ACT

### A.   Applicable Law

#### 1.   The False Claims Act

54.     For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides in pertinent part that:

(a) Any person who

    (1)   knowingly presents, or causes to be presented, to an officer employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

    (2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

    (3)   conspires to defraud the Government by getting a false or fraudulent claim allowed or paid

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claims.  31 U.S.C. § 3729(a).  The FCA defined "claim" at that time to include: "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C § 3729(c).

55.     For conduct occurring after May 20, 2009, the FCA provides that any person who

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008);

(C)     conspires to defraud the Government by committing a violation of the FCA

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a)(1).

56.     The amended FCA defines "claim" as:

(A) mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

> (I) provides or has provided any portion of the money or property requested or demanded; or
>
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded…

57.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal court on behalf of the United States and to share in any recovery as authorized by 31 U.S.C. § 3730.

### 2.     The Federal Anti-Kickback Statute

58.     The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2). In pertinent part, the Anti-Kickback Statute provides:

> (b) Illegal remuneration
>
> (1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> > (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly,

overtly or covertly, in cash or in kind to any person to induce such person—

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(3)    Paragraphs (1) and (2) shall not apply to—

(A)    a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program.

42 U.S.C. § 1320a-7b(b). Those who violate the statute are subject to exclusion from participation in federal health care programs, as well as civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

59.    "Remuneration" is broadly defined to include anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program. Pursuant to the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false or fraudulent claim for purposes of the FCA. See P.L. 111-148, § 6402, codified as 42 U.S.C. § 1320a-7b(g).

60.    The purpose of the Anti-Kickback Statute is to prohibit such activities in order to secure proper medical treatment and referrals and to limit unnecessary treatments, services, or

goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services. *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088, 3089 (proposed Jan. 23, 1989) (to be codified 42 C.F.R. pt. 1001).

61.     Paying or receiving kickbacks creates a conflict of interest and taints an entire claim.  Any defendant convicted under the statute is automatically barred from participating in federal and federally-funded healthcare programs.

**B.     Zydus's Violations of the FCA**

    **1.     Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A); formerly 31 U.S.C. § 3729(a)(1))**

62.     Zydus knowingly caused to be presented false or fraudulent claims for reimbursement (i.e., for payment or approval) to the United States for the Zydus generic drugs, claims that were for substantially higher amounts of money than the retail pharmacies' actual acquisition costs and were based on Publishers prices that Zydus fraudulently and artificially created.   By creating and carrying out this fraudulent scheme, Zydus repeatedly and with continued knowledge violated the False Claims Act, 31 U.S.C. §3729(a)(1).

63.     Additionally, Zydus violated the Anti-Kickback Statute when Zydus knowingly established false and fraudulent AWP and WAC prices and reported such prices to the Publishers, as Zydus knew that Medicaid relied on those prices to establish reimbursement rates for Zydus's generic drugs.  Zydus knowingly offered retail pharmacy customers much lower prices than those reported to Publishers to create a spread and induce its customers to purchase the Zydus generic drugs.  Zydus knowingly used the spread as an unlawful inducement in violation of the federal Anti-Kickback Statute, causing false and/or fraudulent claims to be submitted.

64.    Kickback-tainted claims are non-reimbursable because compliance with the Anti-Kickback statute is a condition of payment of any claims submitted for payment to federal healthcare programs, including Medicaid.   Furthermore, claims resulting from a kickback scheme are inherently false or fraudulent as the claims are the product of false or fraudulent conduct.

65.    Given the structure of the health care systems at issue, given Zydus's false statements and representations, and given the false records that Zydus made, used, or caused to be made or used, Zydus's conduct has the potential to influence the government's payment decision.

66.    The ultimate submission by the retail pharmacies of false and/or fraudulent pharmaceutical claims to the state Medicaid programs was a foreseeable factor in the Government's loss and a consequence of the scheme.   Consequently, the States and the United States Government have suffered substantial damages.

    **2.    Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B); formerly 31 U.S.C. § 3729(a)(2))**

67.    Zydus knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.   These false statements or records consist of false certifications or representations made or caused to be made by Zydus to the state Medicaid programs when seeking to participate in the various programs.   Additionally, Zydus made or caused to be made false representations regarding the Zydus generic drugs when it reported false and fraudulent prices to the Publishers, knowing that such prices were used to establish the FUL, EAC, or MAC on which reimbursements were based.

68.     Retail pharmacies make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  The following are representative samples of the types of certifications health care providers make when entering Medicaid Provider Agreements with the State Medicaid Programs:

69.     The New Jersey Department of Health and Senior Services requires providers enrolling in the Medicaid program to agree "to comply with all applicable State and Federal Medicaid laws and policies, and rules and regulations promulgated pursuant thereto . . . ." and "to comply with Section 1909 of P.L. 92-603, Section 242(c) which makes it a crime for persons found guilty of making any false statement or representation of a material fact in order to receive any benefit or payment under the Medicaid Assistance program…." <u>Provider Agreement Between New Jersey Department of Health and Senior Service and Provider</u>, at 1, Items 1 and 5, http://www.state.nj.us/health/forms/pe-1.pdf, and incorporated by reference herein.

70.     The New York State Medicaid provider enrollment form states the following:

> "By signing this enrollment form for participation in the New York State Medicaid Program, the Applicant/Provider understands and agrees to the following:
>
> As a Medicaid Provider you agree to comply with the rules, regulations and official directives of the Department including, but not limited to Part 504 of 18NYCRR which can be found at the Department of Health's website,www.health.ny.gov. …
>
> As a Medicaid Provider you agree to abide by all applicable Federal and State laws as well as the rules and regulations of other New York State agencies particular to the type of program covered by this enrollment application. …
>
> WHOEVER KNOWINGLY AND WILLFULLY MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR REPRESENTATION ON THIS STATEMENT MAY BE PROSECUTED UNDER APPLICABLE FEDERAL OR STATE

24

> LAWS. IN ADDITION, KNOWINGLY AND WILLFULLY
> FAILING TO FULLY AND ACCURATELY DISCLOSE THE
> INFORMATION REQUESTED MAY RESULT IN DENIAL OF
> A REQUEST TO PARTICIPATE OR WHERE THE ENTITY
> ALREADY PARTICIPATES, A TERMINATION OF ITS
> AGREEMENT OR CONTRACT WITH THE STATE AGENCY
> OR SECRETARY, AS APPROPRIATE."

New York State Medicaid Enrollment Form, at 6, https://www.emedny.org/info/providerenrollment/ProviderMaintForms/436801_PRACT_FORM _PractionerEnrlForm.pdf (capitalization in original).

71.     By signing the Oklahoma SoonerCare[2] General Provider Agreement, which is a contract between providers and the Oklahoma Health Care Authority (OHCA), providers must agree to "comply with all applicable statutes, regulations, policies, and properly promulgated rules of OHCA." SoonerCare General Provider Agreement, at 2, https://www.ohcaprovider.com/Enrollment/Prod/LegalDocs/General_Agreement_2014-1.pdf. The Agreement also warns providers that "[s]atisfaction of all claims will be from federal and state funds. Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted." *Id.* at 4.

72.     The SoonerCare Agreement further requires providers to "acknowledge and expect [that] (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of healthcare professions, and (iv) any other laws cited in the Agreement may change. The parties shall be mutually bound by such changes." *Id.* at 5.

73.     Perhaps most importantly, the SoonerCare Agreement specifically requires providers to comply and certify compliance with the Federal Anti-Kickback Statute (42 USC 1320a-7b *et seq.*) and the Federal False Claims Act (31 USC 3729-3733; 31 USC 3801). *Id.* at 6.

---

[2] The Oklahoma Medicaid program is known as "SoonerCare."

25

Finally, the terms of the Agreement permit OHCA to terminate its agreement with the provider "immediately…upon evidence of fraud," thus demonstrating that compliance with federal and state statutes and regulations is material to the State of Oklahoma's decision to contract with and reimburse a provider. *Id.* at 9.

74.     In addition, every time they submit an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, pharmacists also make express and/or implied certifications that they have complied with state and federal laws applicable to the Medicaid program and that there has not been a material omission. Given the structure of the health care systems at issue, given Zydus's false statements and representations, and given the false records that Zydus made, used, or caused to be made or used, Zydus's conduct had the potential to influence the government's payment decision.

75.     The ultimate submission by the retail pharmacies of false and/or fraudulent pharmaceutical claims to the state Medicaid programs was a foreseeable factor in the Government's loss and a consequence of the scheme.  Consequently, the states and the United States Government have suffered substantial damages.

### 3.     Conspiracy to Defraud the Government (31 U.S.C. 3729(a)(1)(C); formerly 31 U.S.C. § 3729(a)(3))

76.     Zydus and its retail pharmacy customers conspired with one another to submit false claims for reimbursement for Zydus's generic drugs to state Medicaid programs and to receive reimbursement for these drugs to which they were not entitled.

77.     As part of the scheme and agreement to obtain reimbursement for Zydus's generic drugs, Zydus provided fraudulent prices to the Publishers knowing that Medicaid programs relied on those prices to establish reimbursement rates for Zydus's generic drugs.  Zydus then offered its retail pharmacy customers significant discounts in the prices for its generic drugs.

These discounted prices served as a financial incentive for the retail pharmacy customers to purchase Zydus's generic drugs instead of its generic competitor drugs that offered smaller spreads and assured Zydus an increase in the amount of prescriptions for those drugs. Zydus and its retail pharmacy customers realized larger profits as a result.

78.     Given the structure of the health care systems at issue, and given Zydus's conspiracy with its retail pharmacy customers regarding the prices for Zydus's generic drugs, Zydus's conduct had the potential to influence the government's payment decision.

79.     The ultimate submission by the retail pharmacies of false and/or fraudulent pharmaceutical claims to the state Medicaid programs was a foreseeable factor in the Government's loss and a consequence of the scheme. Consequently, the Government Plaintiffs have suffered substantial damages.

## VIII.   CAUSES OF ACTION

### A.     COUNT I – FALSE CLAIMS (31 U.S.C. § 3729(a)(1)(A); formerly 31 U.S.C. § 3729(a)(1))

80.     Relators reallege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Second Amended Complaint.

81.     As a result of Zydus's pricing schemes, all of the claims that Zydus caused pharmacists to submit to the state Medicaid programs are false and/or fraudulent. In addition, the kickbacks Zydus gave to retail pharmacists to induce them to purchase Zydus's generic drugs rendered the submitted claims false and/or fraudulent. Zydus knowingly caused such false or fraudulent claims to be presented for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1)).

82.     The United States paid the false and/or fraudulent claims.

83.     By virtue of the false and/or fraudulent claims that Zydus knowingly presented or caused to be presented, the United States government has suffered substantial monetary damages.

**B.      COUNT II – FALSE RECORDS OR STATEMENTS (31 U.S.C. § 3729(a)(1)(B); formerly 31 U.S.C. § 3729(a)(1))**

84.     Relators reallege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Second Amended Complaint.

85.     As a result of Zydus's pricing schemes and kickbacks to retail pharmacists, Zydus knowingly made, used, or caused to be made or used, false records or statements (a) to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a), or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). These false statements or records consist of false certifications or representations made or caused to be made by Zydus to the state Medicaid programs when seeking to participate in the various programs.  Additionally, Zydus made or caused to be made false representations regarding the Zydus generic drugs when it reported false and fraudulent prices to the Publishers, knowing that the Medicaid programs used such prices to establish the EAC or MAC on which reimbursements were based.  Each claim for reimbursement for the Zydus generic drugs at issue in this case that was submitted to the Government represents a false and/or fraudulent claim for payment.

86.     Zydus further knowingly caused its retail pharmacy customers to make or use false records or statements (a) to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a), or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).  Each time a retail pharmacy submitted an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, its pharmacist made express and/or implied certifications that the

pharmacy had complied with state and federal laws applicable to the Medicaid program. Zydus caused retail pharmacists to falsely certify compliance with these laws when they submitted claims to the state Medicaid programs for reimbursement for the Zydus generic drugs at issue in this case.

87.     By virtue of the false records or statements that Zydus made or used, the United States Government has suffered substantial monetary damages.

**C.     COUNT III – CONSPIRACY TO DEFRAUD GOVERNMENT (31 U.S.C. § 3729(a)(1)(C); formerly 31 U.S.C. 3729(a)(3))**

88.     Relators reallege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Second Amended Complaint.

89.     Zydus conspired with its retail pharmacy customers by offering these customers significantly lower prices for its generic drugs to induce these customers to purchase the Zydus generic drugs, while Zydus reported false and fraudulent prices to the Publishers knowing that Medicaid relied on such prices to establish reimbursement rates for Zydus's generic drugs.  By agreeing to the financial incentive of this price spread scheme, in violation of the Anti-Kickback Statute, Zydus and its retail pharmacy customers caused all the claims submitted by such customers to Medicaid for Zydus's generic drugs to be false and fraudulent.  Accordingly, Zydus and its retail pharmacy customers conspired to defraud the United States by (a) getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3), or (b) committing a violation of 31 U.S.C. § 3729(a), in violation of 31 U.S.C. § 3729(a)(1)(C).

90.     By virtue of the conspiracy between Zydus and its retail pharmacy customers, the Government has suffered substantial monetary damages.

## PRAYER FOR RELIEF

91.     On behalf of the United States, and on their own behalf, Relators pray that the

Court enter judgment against Defendant for the following:

(1)     Damages in the amount of three (3) times the actual damages
        suffered by the United States as a result of Defendant's conduct;

(2)     Civil penalties against Defendant up to the maximum allowed by
        law for each violation of 31 U.S.C. § 3729;

(3)     The maximum award Relators may recover pursuant to 31 U.S.C.
        § 3730(d);

(4)     All costs and expenses of this litigation, including attorneys' fees
        and costs of court; and

(5)     All other relief on behalf of Relators or the United States that the
        Court deems just and proper.

### D.     COUNT IV - CALIFORNIA FALSE CLAIMS ACT

92.     Relators have voluntarily dismissed Count IV. *See* ECF No. 207 (Relators' Rule

41 Notice of Voluntary Dismissal of Count IV).

### E.     COUNT V – CONNECTICUT ACT IMPLEMENTING THE PROVISIONS OF THE BUDGET CONCERNING HUMAN SERVICES AND MAKING CHANGES TO VARIOUS SOCIAL SERVICES STATUTES

93.     Relators have voluntarily dismissed Count V. *See* ECF No. 207 (Relators' Rule

41 Notice of Voluntary Dismissal of Count V).

### F.     COUNT VI–COLORADO MEDICAID FALSE CLAIMS ACT

94.     Relators have voluntarily dismissed Count VI. *See* ECF No. 207 (Relators' Rule

41 Notice of Voluntary Dismissal of Count VI).

### G.     COUNT VII - DELAWARE FALSE CLAIMS AND REPORTING ACT

95.     Relators have voluntarily dismissed Count VII. *See* ECF No. 204 (Relators' Rule

41 Notice of Voluntary Dismissal of Count VII).

**H.      COUNT VIII - DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT**

96.     Relators have voluntarily dismissed Count VIII. *See* ECF No. 204 (Relators' Rule 41 Notice of Voluntary Dismissal of Count VIII).

**I.      COUNT IX - FLORIDA FALSE CLAIMS ACT**

97.     Relators have voluntarily dismissed Count IX. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count IX).

**J.      COUNT X – GEORGIA FALSE MEDICAID CLAIMS ACT**

98.     Relators have voluntarily dismissed Count X. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count X).

**K.      COUNT XI - HAWAII FALSE CLAIMS ACT**

99.     Relators have voluntarily dismissed Count XI. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XI).

**L.      COUNT XII - ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT**

100.     Relators have voluntarily dismissed Count XII. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XII).

**M.      COUNT XIII – INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

101.     Relators have voluntarily dismissed Count XIII. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XIII).

**N.      COUNT XIV – IOWA FALSE CLAIMS ACT**

102.     Relators have voluntarily dismissed Count XIV. *See* ECF No. 204 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XIV).

O.    **COUNT XV - LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**

103.    Relators have voluntarily dismissed Count XV. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XV).

P.    **COUNT XVI – MARYLAND FALSE CLAIMS ACT**

104.    Relators have voluntarily dismissed Count XVI. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XVI).

Q.    **COUNT XVII - MASSACHUSETTS FALSE CLAIMS ACT**

105.    Relators have voluntarily dismissed Count XVII. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XVII).

R.    **COUNT XVIII - MICHIGAN MEDICAID FALSE CLAIMS ACT**

106.    Relators have voluntarily dismissed Count XVIII. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XVIII).

S.    **COUNT XIX – MINNESOTA FALSE CLAIMS ACT**

107.    Relators have voluntarily dismissed Count XIX. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XIX).

T.    **COUNT XX - MONTANA FALSE CLAIMS ACT**

108.    Relators have voluntarily dismissed Count XX. *See* ECF No. 204 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XX).

U.    **COUNT XXI - NEVADA FALSE CLAIMS ACT**

109.    Relators have voluntarily dismissed Count XXI. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XXI).

## V.   COUNT XXII – NEW HAMPSHIRE MEDICAID FRAUD AND FALSE CLAIMS ACT

110.   Relators have voluntarily dismissed Count XXII. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XXII).

## W.   COUNT XXIII - NEW JERSEY FALSE CLAIMS ACT

111.   Relators reallege and hereby incorporate by reference each allegation contained in the preceding paragraphs of this Second Amended Complaint.

112.   This is a *qui tam* action brought by Relators and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. STAT. ANN. §§ 2A:32-C1–2A:32-C18.

113.   N.J. STAT. ANN. § 2A:32C-3 provides liability for any person who-

    (a)    knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

114.   The Defendant has knowingly violated N.J. STAT. ANN. § 2A:32C-3 from at least 2006 to the present by violating the Federal Anti-Kickback Statute, as described herein.

115.   As a result of Zydus's pricing schemes, all of the claims that Zydus caused its retail pharmacy customers to submit to the New Jersey Medicaid program are false or fraudulent. Further, Zydus caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent

acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

116.    The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

117.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendant had the potential to influence the State of New Jersey's payment decision.

118.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of New Jersey's loss and a consequence of the scheme.

119.    As a result of the Defendant's violations of N.J. STAT. ANN. § 2A:32C-3, the State of New Jersey has been damaged.

120.    There are no bars to recovery under N.J. STAT. ANN. § 2A:32C-9(c), and, or in the alternative, Relators are an original source as defined therein.  Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.J. STAT. ANN. § 2A:32C-5(b) on behalf of themselves and the State of New Jersey.

121.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against the Defendant:

To the STATE OF NEW JERSEY:

(1)     Three times the amount of actual damages that the State of New Jersey has sustained as a result of the fraudulent and illegal practices of the Defendant;

(2)     A civil penalty of up to the maximum allowed by law for each false claim that the Defendant presented or caused to be presented to the State of New Jersey;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATORS RAHIMI & RASHID:

(1)     The maximum amount allowed pursuant to N.J. STAT. ANN. § 2A:32C-37 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**X.      COUNT XXIV - NEW MEXICO MEDICAID FALSE CLAIMS ACT**

122.     Relators have voluntarily dismissed Count XXIV. *See* ECF No. 204 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XXIV).

**Y.      COUNT XXV- NEW YORK FALSE CLAIMS ACT**

123.     Relators reallege and hereby incorporate by reference each allegation contained in the preceding paragraphs of this Second Amended Complaint.

124.     This is a *qui tam* action brought by Relators and State of New York to recover treble damages and civil penalties under the New York False Claims Act, N.Y. STATE FIN. LAW § 187 *et seq*.

125.     N.Y. STATE FIN. LAW § 189(1) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)     conspires to commit a violation of § 189(1).

126.     The Defendant has knowingly violated the New York False Claims Act from at least 2006 to the present by violating the Federal Anti-Kickback Statute, as described herein.

127.     As a result of Zydus's pricing schemes, all of the claims that Zydus caused its retail pharmacy customers to submit to the New York Medicaid program are false or fraudulent. Further, Zydus caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

128.     The State of New York, by and through the State of New York Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

129.     Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendant had the potential to influence the State of New York's payment decision.

130.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of New York's loss and a consequence of the scheme.

131.     As a result of the Defendant's violations of N.Y. STATE FIN. LAW § 189, the State of New York has been damaged.

132.     There are no bars to recovery under N.Y. STATE FIN. LAW § 190(9), and, or in the alternative, Relators are an original source as defined therein.  Relators are private persons with

36

direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.Y. STATE FIN. LAW § 190(2) on behalf of themselves and the State of New York.

133.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against the Defendant:

To the STATE OF NEW YORK:

(1)     Three times the amount of actual damages that the State of New York has sustained as a result of the fraudulent and illegal practices of the Defendant;

(2)     A civil penalty of up to the maximum allowed by law for each false claim that the Defendant presented or caused to be presented to the State of New York;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATORS RAHIMI & RASHID:

(1)     The maximum amount allowed pursuant to N.Y. STATE FIN. LAW § 190(6) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Z.      COUNT XXVI – NORTH CAROLINA FALSE CLAIMS ACT**

134.    Relators have voluntarily dismissed Count XXVI. *See* ECF No. 192 (Order granting Relators' voluntary dismissal of Count XXVI).

**AA.    COUNT XXVII – OKLAHOMA MEDICAID FALSE CLAIMS ACT**

135.    Relators reallege and hereby incorporate by reference each allegation contained in the preceding paragraphs of this Second Amended Complaint.

136.    This is a *qui tam* action brought by Relators and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 OKLA. STAT. ANN. § 5053.1 *et seq.*

137.    63 OKLA. STAT. ANN. § 5053.1(B) provides liability for any person who-

        (a)     knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

        (b)     knowingly makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim paid or approved by the state;

        (c)     conspires to defraud the State by getting a claim allowed or paid;

138.    The Defendant has knowingly violated 63 OKLA. STAT. ANN. § 5053.1(B) from at least 2006 to the present by violating the Federal Anti-Kickback Statute and the Oklahoma Anti-Kickback Statute (56 OKLA. STAT. ANN. § 1005), as described herein.

139.    As a result of Zydus's pricing schemes, all of the claims that Zydus caused its retail pharmacy customers to submit to the Oklahoma Medicaid program are false or fraudulent. Further, Zydus caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the

38

Oklahoma Anti-Kickback Statute (56 OKLA. STAT. ANN. § 1005).  Compliance with federal and state laws and regulations were conditions of payment.

140.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

141.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendant had the potential to influence the State of Oklahoma's payment decision.

142.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of Oklahoma's loss, and a consequence of the scheme.

143.    As a result of the Defendant's violations of 63 OKLA. STAT. ANN. § 5053.1(B), the State of Oklahoma has been damaged.

144.    There are no bars to recovery under 63 OKLA. STAT. ANN. § 5053.5, and, or in the alternative, Relators are an original source as defined therein.  Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 63 OKLA. STAT. ANN. § 5053.2 on behalf of themselves and the State of Oklahoma.

145.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against the Defendant:

To the STATE OF OKLAHOMA:

39

(1)     Three times the amount of actual damages that the State of Oklahoma has sustained as a result of the fraudulent and illegal practices of the Defendant;

(2)     A civil penalty of up to the maximum allowed by law for each false claim that the Defendant presented or caused to be presented to the State of Oklahoma;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATORS RAHIMI & RASHID:

(1)     The maximum amount allowed pursuant to 63 OKLA. STAT. ANN. § 5053.4, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**BB.     COUNT XXVIII - RHODE ISLAND STATE FALSE CLAIMS ACT**

146.     Relators have voluntarily dismissed Count XXVIII. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XXVIII).

**CC.     Count XXIX - TENNESSEE MEDICAID FALSE CLAIMS ACT**

147.     Relators have voluntarily dismissed Count XXIX. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XXIX).

**DD.     COUNT XXX - TEXAS MEDICAID FRAUD PREVENTION ACT**

148.     The parties and the State of Texas previously reached a settlement concerning the conduct alleged by Relators in Count XXX.

## EE.   COUNT XXXI - VIRGINIA FRAUD AGAINST TAXPAYERS ACT

149.    Relators have voluntarily dismissed Count XXXI. *See* ECF No. 190 (Order granting Relators' voluntary dismissal of Count XXXI).

## FF.   COUNT XXXI - WISCONSIN FALSE CLAIMS ACT

150.    Relators have voluntarily dismissed Count XXXI. *See* ECF No. 207 (Relators' Rule 41 Notice of Voluntary Dismissal of Count XXXI).

## GG.   COUNT XXXIII – CITY OF CHICAGO FALSE CLAIMS ACT

151.    Relators have voluntarily dismissed Count XXXIII. *See* ECF No. 145 (Order granting Relators' voluntary dismissal of Count XXXIII).

## HH.   COUNT XXXIV – COMMON FUND RELIEF

152.    Relators reallege and hereby incorporate by reference each allegation contained in the preceding paragraphs of this Second Amended Complaint.

153.    While the states possessing *qui tam* statutes have a regulatory scheme for rewarding the Relators for coming forward, those that have none will potentially receive a windfall with little or no investigation or commitment of time or resources to the recovery.  The common-fund doctrine preserves the right of the litigant or counsel to an award from the common fund generated.   The United States Supreme Court and many other courts have addressed this remedy.  *Boeing Company v. Van Gemert*, 444 U.S. 472 478 (1980):

> Since the decisions in *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882), and *Central Railroad & Banking Co. v. Pettuss*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. [citations omitted].  The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough*, supra 105 U.S., at 532-537, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees [citations omitted].  The doctrine rests upon the perception that persons who obtain the benefit of the lawsuit

41

without contributing to its cost are unjustly enriched at the successful litigant's expense [citation omitted].  Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionally among those benefitted by this suit. [citations omitted].

Accord, *In re Smithkline Beckman Corp. Securities Litig.*, 751 F. Supp. 525, 531 (E.D. Pa. 1990).

A string of cases recognizes the common fund doctrine for situations such as those that may arise in this case. *See* "The Common Fund Doctrine: Coming of Age in the Law of Insurance Subrogation," 31 Ind. L. Rev. 313, 337–38 (1998).  Relators respectfully request this Court to award them a percentage share from the common fund generated by their actions.

## IX.    DEMAND FOR JURY TRIAL

154.    Pursuant to Federal Rule of Civil Procedure 38, Relators demand a trial by jury.

## X. DOCUMENTARY EVIDENCE

155.    The documentary evidence referenced herein consists of the following:[3]

| Exhibit No. | Description | Bates Number |
|---|---|---|
| 1 | Potomac Health Pharmacy: Cardinal Wholesaler Pricing List Database | BAZ000001-2 |
| 2 | Table of Prices and Spreads | BAZ000002.1 |
| 3 | Venlafaxine Hydrochloride Tablets Claim and Invoice | BAZ000003 |
| 4 | Amiodarone Hydrochloride Tablets Claim and Invoice | BAZ000004 |
| 5 | Divalproex Sodium Capsules Claim and Invoice | BAZ000005 |
| 6 | Tamsulosin Hydrochloride Capsules Claim and Invoice | BAZ000006 |
| 7 | Warfarin Sodium Tablets Claim and Invoice | BAZ000007-8 |
| 8 | Paroxetine Tablets Claim and Invoice | BAZ000009-10 |
| 9 | Anastrozole Tablets Claim and Invoice | BAZ000011 |
| 10 | Carvedilol Tablets Claim and Invoice | BAZ000012 |
| 11 | Topiramate Tablets Claim and Invoice | BAZ000013 |
| 12 | Meloxicam Tablets Claim and Invoice | BAZ000014 |
| 13 | Medicaid Prescription Reimbursement Information by State – Quarter Ending June 2011 | BAZ000015-21 |

---

[3] Exhibits 1 – 12 were submitted with the Original Complaint, and Exhibit 13 was submitted with the First Amended Complaint. No additional exhibits are being submitted with this Second Amended Complaint.

WHEREFORE, Relators respectfully request all relief described herein.

Respectfully submitted,

Michael D. Fitzgerald
State Bar No. 004391985
**Law Offices of Michael D. Fitzgerald**
1 Industrial Way W., Building B
Eatontown, NJ 07724
Telephone (732) 223-2200
Facsimile (732) 223-7299
mdfitz@briellelaw.com


**Berg & Androphy**
Joel M. Androphy (*pro hac vice*)
jandrophy@bafirm.com
Janis G. Gorton (*pro hac vice*)
jgorton@bafirm.com
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785


**Law Offices of Patrick J. O'Connell**
Patrick O'Connell (*pro hac vice*)
pat@pjofca.com
2525 Wallingwood Dr., Bldg. 14
Austin, Texas 78746
Telephone (512) 222-0444
Facsimile (512) 222-0422

**ATTORNEYS FOR AZAM RAHIMI
AND RADIF RASHID**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was delivered to counsel for Defendants via ECF/Pacer on June 14, 2018. I further certify that a true and correct copy of this Second Amended Complaint was forwarded via the United States Mail, certified, return receipt requested, to the United States Attorney's Office, District of New Jersey, the Department of Justice, and the Attorneys General of the States of New Jersey, New York, and Oklahoma on June 14, 2018.

Michael D. Fitzgerald